# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3747 | **DATE** | 6/4/2003 |
| **CASE TITLE** | Terry Barnett vs. Willard Strom | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Because there is no dispute as to the facts that bear upon the current issue, it is capable of resolution as a matter of law. This Court grants plaintiffs' motion for a determination that defendants are estopped to deny infringement of the '474 Patent, and this Court so holds. (35-1) This action is set for a status hearing at 8:45 a.m. June 12, 2003 to discuss the further steps needed to bring the case into a posture of readiness for trial.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | JUN 5 2003 | |
| | Notified counsel by telephone. | | date docketed | 45 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | 6/4/2003 | |
| | Copy to judge/magistrate judge. | 03 JUN -4 AM 11:22 | date mailed notice | |
| SN | courtroom deputy's initials | Date/time received in central Clerk's Office | SN mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERRY BARNETT, et al., )
)
        Plaintiffs, )
)
v. ) No. 02 C 3747
)
WILLARD STROM, et al., )
)
        Defendants. )

MEMORANDUM OPINION AND ORDER

This patent action involves an unusual scenario: It asserts that an inventor, original patentee Willard Strom ("Strom"), together with his wife Victoria and their corporation C & S Manufacturing Co. ("C&S"), are illegally infringing Strom's own intellectual brainchild. Terry Barnett ("Barnett"), who is now the owner of the patent in suit (Patent No. 5,819,474--the "'474 Patent"), and Strom Closures, Inc. ("Strom Closures")[1] have sued Strom, his wife and C&S charging such infringement. Now at issue is what plaintiffs' counsel has inaccurately characterized as "Plaintiffs' Motion for Summary Judgment That Defendants Are Estopped To Deny Infringement of U.S. Patent No. 5,819,474."[2]

---

[1] Originally Strom Closures was a corporation that had been formed and was owned by Strom and his associate Jeff Davenport ("Davenport"). In 1996 Barnett became an investor in and officer of Strom Closures, and later that year Davenport parted company with the corporation. Then Strom too left Strom Closures, so that it became (as it now remains) Barnett's company.

[2] Summary judgment is of course the wrong label for a motion such as this, which simply seeks to get a ruling on an issue of law that is not ultimately dispositive, either of the case as such or of a discrete claim within the case. Fed. R.

## Background

Despite the inappropriateness of the summary judgment label for the current motion (see n.2), it has accomplished a constructive purpose in facilitating the present ruling. Because plaintiffs' attachment of that label has caused counsel for both litigants to comply with the procedural requirements of this District Court's LR 56.1 (which has been adopted to implement Rule 56), the factual matrix for dealing with the current motion has been provided to this Court. And that factual matrix discloses that there are indeed no genuine issues of material (that is, outcome- determinative) fact that bear upon the motion.

As stated earlier, Strom was the original inventor and patentee of the '474 Patent, which covers a particular type of temporary shelter and a method for making it. Having then formed Strom Closures in 1995, Strom granted that corporation an exclusive license under the then-pending patent application. Defendants' position is that the 1995 license agreement just referred to was superseded by a September 6, 1996 License Agreement ("Agreement") among Strom, Barnett and David Barnett as licensors and Strom Closures as licensee,[3] under which Strom

---

Civ. P. ("Rule") 16 is a far more hospitable haven than Rule 56 for such an issue-narrowing motion that, if successful, may advance the case toward ultimate disposition.

[3]Because both the 1995 and 1996 documents were expressly made exclusive license agreements, it is unnecessary to explore how and why the latter entered the picture, or which document

Closures was again granted an exclusive license under the patent when issued "to manufacture, package, market and sell the Product throughout the world."[4] After some disagreements among the principals led to Strom's departure from ownership and officership in Strom Closures in November 1998, he began to do business as C&S, which he then incorporated in August 2000. Although he clearly had no right at all to do so in light of the previously-granted exclusive license running to Strom Closures, on August 29, 2000 Strom executed a purported License Agreement with C&S under which Strom assertedly granted a license to C&S under the '474 Patent.

Strom then fell on hard times that led to his instituting voluntary bankruptcy proceedings in the Bankruptcy Court for this District on January 9, 2001. Just where he or his lawyer got the idea is unclear, but Strom's Schedule B in the bankruptcy case listed his purported ownership of 50% of Strom Closures' common stock and his 100% ownership of the '474 Patent. In all events the end result of Strom's claims in that respect produced two

---

controls the parties' relationship.

[4] "Product" was defined as "a certain product providing a temporary shelter exit and entry system currently being marketed and sold as 'Stik'n Zip'" and "to manufacture, package, market and sell any other invention relating to the Product or parts thereof under any letters patent issued therefor." Agreement ¶7 provided that the exclusive license was to terminate "upon the earlier of the expiration of the Patent (or any reissues, renewals or extensions thereof) or the dissolution of the licensee"--and neither of those things has occurred to date.

documents that are relevant for current purposes:

1.   One document captioned "Assignment of Patent" and dated as of December 18, 2001 ran between Strom as assignor, through his Chapter 7 Trustee in bankruptcy, and Barnett as assignee. That document (a) confirmed the recognition earlier that month of the transfer of all of Strom's "right, title and interest" in and to the '474 Patent to the bankruptcy estate and (b) authorized the Trustee to transfer, sell or assign the '474 Patent to Barnett as assignee. Its operative provisions did just that.

2.   That Assignment of Patent was in partial implementation of a November __, 2001 Asset Purchase Agreement between Barnett as purchaser and the Bankruptcy Trustee as seller that (a) referred to Strom's Schedule B listings, (b) stated that "there may be a dispute as to the extent of Seller's interest in Strom Closures, Inc. and the Patent" and hence (c) provided for Barnett's purchase from the Trustee of what were defined in that document's Section 1.1 as the "Acquired Assets":

(a)   all of the Seller's rights, title and interest in and to all of the shares of common stock and any other equity interest in Strom Closures, Inc. (the "Strom Stock"); and

(b)   all of the Seller's rights, title and interest in and to United States Letters Patent No. 5,819474, issued on October 13, 1998 entitled "Temporary Shelter and Method of Making Same" (the "Patent").

4

Heedless of everything that had taken place, as described above, that plainly divested him of any interest in both the '474 Patent and Strom Closures, Strom has not only continued through C&S to produce and sell products in competition with Strom Closures (the C&S product is marketed as "THE ZIPPER"), but he has also, despite his having orally terminated his invalid August 29, 2000 License Agreement running to C&S:

1. prepared an instruction sheet for THE ZIPPER product -- a document used by C&S to instruct purchasers how to use that product -- that expressly referred to the '474 Patent, a reference that Strom's deposition confirmed had as its purpose the warning away of other potential competitors from duplicating THE ZIPPER product, thus obtaining a commercial advantage for C&S;

2. prepared other instruction sheets for C&S that also included references to the '474 Patent for the same purpose;

3. participated in the preparation of C&S' notification to its customers to inform them about THE ZIPPER product, a notification that referred to the product as being "Designed and Patented by Willard Strom"; and

4. approved the packaging of THE ZIPPER product for its sale to consumers in retail stores -- packaging that likewise refers specifically to the '474 Patent as though THE ZIPPER were produced under the protection of the patent.

5

## Strom Closures as Exclusive Licensee

Before this opinion turns to the key question of estoppel that forms the gravamen of plaintiffs' motion, it is forced into a byway by defendants' legally frivolous argument that Strom Closures is no longer the exclusive licensee of the '474 Patent. According to defendants, the License Agreement (whether the 1995 version or the 1996 version) was somehow cancelled by the Asset Purchase Agreement, as to which defendants' LR 56.1 response asserts:

> Plaintiff Strom Closures is not an exclusive licensee under the '474 Patent in suit. As of December 18, 2001, the '474 patent was sold "free and clear of any and all ENCUMBRANCES" (Defendants' Exhibit H at 2.1). Accordingly, even if Strom Closures had been an exclusive license [sic] under the patent prior to that date, since that date the license has been extinguished.

That argument is frankly bogus, and defense counsel have to know that(at least if they practice with a modicum of intellectual honesty). When Strom filed in bankruptcy, all that he owned was title to the '474 Patent (an asset that is now owned by Barnett as a result of the Asset Purchase Agreement)--but his title to that asset was then expressly subject to the existing exclusive license in favor of Strom Closures. And with that limited interest[5] being all that Strom then owned as an asset, it

---

[5] It is of course conventional wisdom that an *exclusive* license is essentially equivalent to vesting full ownership of a patent in the licensee--subject of course to any requirements of the license agreement for the payment of royalties or some other

6

was of course all that he (or the Trustee in bankruptcy as his successor) had the right to sell. That being so, reading the Asset Purchase Agreement--and particularly its definition of the Acquired Assets--leaves no question that all the Trustee could then sell, or purported to sell, was the "rights, title and interest in and to United States Letters Patent No. 5,819,474." It was therefore *that* interest that was conveyed by the Assignment of Patent, and the reference in Asset Purchase Agreement §2.1 to the sale and purchase of "the Acquired Assets [being] free and clear of any and all Encumbrances" could not be, and did not purport to be, a transaction that impermissibly extinguished the still-binding exclusive license.

In short, Barnett as purchaser under the Asset Purchase Agreement bought exactly what Strom and then the Trustee in bankruptcy had owned: the title to a patent that was subject to an exclusive license in favor of Strom Closures. That was true before the sale, and nothing in the sale altered that.[6]

---

form of consideration to the person or entity holding legal title to the patent itself.

[6] It seems clear that defense counsel, like other lawyers who pursue an "everything but the kitchen sink" approach in resisting their adversaries' motions (or in advancing their own), have failed to consider the fallout effect that such dubious tactics may generate. Although every judicial officer seeks to look at every argument advanced by any counsel on the merits, it cannot be gainsaid that the assertion of one or more patently groundless contentions might engender skepticism as to the trustworthiness of other arguments that on their own may possess more legitimacy.

## Estoppel

With that preliminary matter out of the way, this opinion turns to plaintiffs' estoppel argument. In that respect it will be recalled that Strom continued for an extended period to continue to market his (and C&S') competing product by including specific identifications of the '474 Patent, both on the instructions for use and on the packaging of THE ZIPPER product. And there is no question about that: Defendants' counsel have themselves submitted a declaration in support of the opposition to the current motion that includes as exhibits the documents already referred to in this opinion and also includes, as Ex. I, a copy of the March 8, 2002 letter from another lawyer for defendants that transmitted to plaintiffs' counsel copies of the instructions that were and are included in THE ZIPPER's packaging, identified by time periods--one form used before Strom's bankruptcy filing, another used after the bankruptcy filing and until February 2002 and then the changed form that became effective in February 2002 -- as well as packaging samples (the latter in two categories, one up to February 2002 and the other thereafter). That March 8, 2002 letter explained the February 2002 watershed changed as being triggered by the time of "notice of patent purchase by Barnett."

That very treatment betrays defendants' (and apparently their lawyers') misunderstanding of one of the most basic

8

fundamentals of patent law and practice: When a patentee has granted an <u>exclusive</u> license, even the patentee is prohibited from practicing the art disclosed by the patent.[7] Any patentee who does so is just as guilty of infringement as any third party that engages in such conduct.

It was therefore wholly irrelevant to defendants' course of action that Strom continued to hold title to the '474 Patent up to a point, with Barnett then acquiring that ownership interest and retaining it thereafter. And it is equally irrelevant that defendants have since changed the instructions and packaging to eliminate reference to the '474 Patent, because THE ZIPPER product that is the target of the present infringement action has remained the same.

As a shorthand label, a good deal of the caselaw that addresses the type of argument now advanced by plaintiffs uses the term "marking estoppel." That is potentially somewhat

---

[7]This is implicit in the term "exclusive." As Robert Harmon, <u>Patents and the Federal Circuit</u> § 7.2(c), at 405 (5th ed. 2001)(footnotes and citations omitted) explains:

> There are significant differences between exclusive and nonexclusive licenses.... Indeed, a true exclusive licensee can sue the patent owner for patent infringement, while a nonexclusive licensee has no standing to sue for infringement.

To the same effect, see, e.g., Ernest Lipscomb III, <u>Lipscomb's Walker on Patents</u> § 20:26, at 93-94 and nn. 18+19 (3d ed. 1987) and cases cited there.

misleading, because those cases typically do not involve conduct as blatant as that presented here. Even though defendants characterize a portion of the lengthy opinion in SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 859 F.2d 878 (Fed. Cir. 1988) as casting a cloud on the use of that doctrine, what SmithKline actually did was first to "note the line of cases sometimes called 'marking estoppel' cases, in which, under some circumstances, a party that marks its product with a patent number is estopped from asserting that the product is not covered by the patent" (id. at 890 n.9, citing cases), but it then went on to distinguish the situation before the court by stating that the defendant there "did not place an erroneous patent number on its lead acetate product" (id. at 890), but instead "erroneously identified the catalyst used on its product" (id.).

By contrast, here defendants specifically announced to the world that THE ZIPPER product is covered by the '474 Patent. C&S did so in unambiguous terms and in several ways: (1) by placing the patent number in a prominent position just before the caption of its Instruction Sheet document, which then proceeded to explain and illustrate the steps for using and installing its product, (2) by placing in equally prominent letters, all in capitals, the phrase "DESIGNED AND PATENTED BY WILLARD STROM" in the same position on another Instruction Sheet and (3) by placing the patent number on the packaging for THE ZIPPER product. And

C&S admittedly did so not only to promote its own product but also to warn off and discourage potential competitors.

Most of the caselaw listed under the "marking estoppel" rubic goes back a good many years -- thus the first citation in the SmithKline footnote was to Gridiron Steel Co. v. Jones & Laughlin Steel Corp., 361 F.2d 791, 796-97 (6th Cir. 1966). But that does not, as defendants would have it, undercut the position advanced by plaintiffs here.

To the contrary, the post-SmithKline discussion of that doctrine and of its scope (as well as its limitations) in Boyd v. Schildkraut Giftware Corp., 936 F.2d 76, 79 (2d Cir. 1991) commends itself to this Court as both demonstrating its continued viability and its square applicability to the conduct involved here. After Boyd, id., referred to the criminal offense defined in 35 U.S.C. §292(a) that prohibits placing a patent number on a product without the consent of the patentee (here, of course, that means the exclusive licensee) "with the intent...of deceiving the public and inducing them to believe that the thing was made or sold by or with the consent of the patentee [again, here the exclusive licensee]," Boyd, id. (citations omitted) went on to refer to prior holdings that "placing a patent number on a product will estop a manufacturer from denying that his product embodies the patent for purposes of liability for both patent infringement damages and patent license royalties." Then Boyd,

11

id. went on to say:

> We think that marking estoppel, like other varieties of estoppel, should arise only when a consideration of all aspects of a defendant's pertinent conduct makes it inequitable for him to take a position contrary to his prior statements or actions. The act of impermissibly placing a patent number on a product, if limited in time and quantity, does not inevitably have such adverse effects for the patentee or the consuming public as to bar the mismarker from establishing that his product does not use the patent. Though a patentee or licensor normally will understandably have evidence only of sporadic instances of mismarking and need not identify widespread mismarking to raise a claim of estoppel, the accused mismarker should be able to defeat the claim by showing how inadvertent and limited the mismarking was. Of course, deliberate mismarking of even a limited nature or inadvertent mismarking over a prolonged period would justify an estoppel.[8]

That last "of course" sentence could well have been written for this case. It is beyond question that the multiple instances of identifying THE ZIPPER product as embodying the '474 Patent were deliberate, as confirmed by Strom's own sworn testimony during his deposition. And for the inventor himself to have done so--to have flouted the express grant of an exclusive license to another--is particularly egregious. Whether the 1995 License Agreement remains in effect or whether it was somehow superseded

---

[8] [Footnote by this Court] Defendants cite to the ruling in High Frequency Prods., Inc. v. Wynn's Climate Sys., Inc., 892 F.Supp. 1515, 1519 (S.D. Fla. 1995) that the marking estoppel doctrine "is no longer viable." With all respect, and even apart from the principle that decisions by district courts (including this one) do not create precedent, this Court finds the just-quoted thoughtful Boyd analysis by the Second Circuit (speaking through an extraordinarily distinguished judicial scholar, the Honorable Jon Newman) to be a balanced and persuasive exposition of the law in this area.

by the 1996 License Agreement (a question that need not be decided for present purposes) is irrelevant, for in neither of them did Strom as licensor reserve <u>any</u> right to practice the art of the '474 Patent.[9]

One final issue should be explored: defendants' contention that this Court should go behind defendants' express acknowledgment that THE ZIPPER is covered by the '474 Patent (and hence that it necessarily infringes the '474 Patent) to determine the infringement issue independently. At least two considerations compel a negative answer to that position.

For one thing, who is in a better position to say whether his own product embodies (and hence infringes) his own invention than the inventor himself? When the inventor and his company have expressly said so, and have said so to obtain a competitive advantage (with the acknowledged intent to warn off other prospective competitors), it would represent the height of irony to ignore that representation in favor of prospectively rewarding those parties with a free pass.

Relatedly, the effect of any estoppel is always to bar the estopped party from obtaining a court review of the issue

---

[9] Both Paragraphs 2(a) and 2(b) of the 1995 Agreement contained unequivocal and unambiguous language of exclusivity and of the absolute nature of the grant to Strom Closures. Sections 2.1 and 2.2 of the 1996 agreement did the same. And in neither document did licensor Strom reserve or impliedly reserve any rights or limit such exclusivity.

13

involved in the estoppel. This situation is no different. To be sure, most estoppel situations involve detrimental reliance by the other party. But here the same result is called for by defendants' motivation to benefit themselves by warning off prospective competition through identifying their own product as patent-covered. This is entirely analogous to the doctrine of consideration in the law of contracts, where consideration for a promise may be found either in detriment to the promisee or in benefit to the promisor.

## Conclusion

Because there is no dispute as to the facts that bear upon the current issue, it is capable of resolution as a matter of law. This Court grants plaintiffs' motion for a determination that defendants are estopped to deny infringement of the '474 Patent, and this Court so holds. This action is set for a status hearing at 8:45 a.m. June 12, 2003 to discuss the further steps needed to bring the case into a posture of readiness for trial.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 3, 2003